# EXHIBIT E



**ARCCA,** INCORPORATED
2288 SECOND STREET PIKE
P.O. BOX 78
PENNS PARK, PA 18943
**PHONE** 215-598-9750 **FAX** 215-598-9751
www.arcca.com

December 4, 2023

Frank W. Baer, Esquire
Perez Morris
524 N. Providence Road
Media, PA 19063

Re:   *Villanova, Leonard and Karen Villanova v. Merck Sharp & Dohme Corp., f/k/a, Merck &*
      *Co., Inc. and Jones Lang LaSalle Americas, Inc., d/b/a, Jones Lang LaSalle and JLL, d/b/a*
      *Labwell and Airgas, Inc. and Airgas USA, LLC, d/b/a Airgas and Airgas-East, Inc., d/b/a*
      *Airgas et al.*
      ARCCA File No.: 6498-003

Dear Mr. Baer:

Thank you for the opportunity to participate in the above-referenced matter. Your firm hired ARCCA, Incorporated to perform an analysis of the subject incident in relation to Mr. Leonard Villanova. This analysis is based on information currently available to ARCCA, and is only to be issued in its entirety. However, ARCCA reserves the right to supplement or revise this report if additional information becomes available.

The opinions given are based on my analysis of the available materials using scientific and engineering methodologies generally accepted in the scientific community.[1] These opinions are also based on my education, experience, background, and knowledge of biomechanics, human factors and kinematics, and human injury mechanisms and tolerance. I am presently employed as a Senior Biomechanist/Human Factors Engineer for an engineering firm known as ARCCA, Inc. I obtained a Doctor of Philosophy degree in Industrial and Systems Engineering, Human Factors Option from Virginia Tech and a Master of Science degree in Industrial and Systems Engineering, with an emphasis in Safety Engineering from Virginia Tech. I also received a Master of Science degree in Mathematics from Virginia Tech and a Bachelor of Arts in Mathematics from the University of Connecticut. I have completed advanced coursework in the fields of musculoskeletal biomechanics, human factors, safety, kinesiology, physiology, ergonomics, occupational biomechanics, and impact biomechanics. I am a Certified Professional Ergonomist (CPE), and a member of the American Society of Biomechanics, American Society of Safety Professionals, Human Factors and Ergonomics Society, ASTM International F13 Committee on Pedestrian/Walkway Safety, International Code Council, International Society for Occupational Ergonomics and Safety, and IEA Slips, Trips and Falls Committee. I maintain an OSHA 30-Hour Outreach Training for the Construction Industry Certification, an OSHA Fall Protection for the Competent Person Certification, an OSHA Scaffolding Safety for the Competent Person Certification, an OSHA 10-Hour Outreach Training Program – General Industry Certification, an OSHA Industrial Truck Operator Certification, an NYC DOB 4-Hour Supported Scaffolding User Certification, an NYC DOB 32-Hour Supported Scaffold Installer/Remover Certification and NYC DOB 8-Hour Site Safety Coordinator Training. I was a National Academies Member of the Committee on Review of the NIOSH Construction Research Program, NIOSH 2019 and 2022 Study Section Grant Reviewer, and in 2011 was designated as one

---

[1]   Carey, S. S. (2011). A Beginner's Guide to Scientific Method (Fourth ed.). Cengage Learning.

Frank W. Baer, Esq.
December 4, 2023
Page 2



of "100 Women Making a Difference in the Safety, Health and Environmental Profession" by ASSE's Women in Safety Engineering.

While at Virginia Tech, I taught courses to both undergraduate and graduate students related to Human Factors Engineering, Industrial Engineering, Safety, and Occupational Biomechanics. I performed experimental three-dimensional motion analyses, as well as extensive kinematic and kinetic studies of the human body. My testing and research have been performed with human subjects. These tests and research studies have added to my formal education in biomechanics and injury causation. As such, I am very familiar with the theory and application of human tolerance to the areas of slip, trip, and fall incidents and ergonomics, as well as the techniques and processes for evaluating mechanisms of injury using scientifically accepted techniques to assess the potential for injury during a particular incident.

Upon graduating from Virginia Tech, I worked for approximately 10 years at the Liberty Mutual Research Institute for Safety in Hopkinton, Massachusetts. During my tenure at Liberty Mutual, I completed multiple research projects that examined the mechanisms of balance control on level and elevated surfaces, including slips and falls and working on ladders. This included the influence of individual, task, and environmental factors. Completion of these projects required knowledge, use, and application of ANSI and ASTM standards to accurately translate real-world situations to laboratory scenarios, and apply laboratory findings to real-world circumstances and conditions. Motivation for the research projects was partially derived from the construction industry and integrated site visits and consultations with field representatives.

I also have extensive experience related to distracted walking, assessment of physical and mental workload, and effects of dual-tasking on performance. I have published in the areas of postural control, gait analysis, occupational biomechanics, and human factors and ergonomics and have given multiple technical presentations at domestic and international scientific conferences. While at ARCCA, I continue to conduct technical lectures dealing with the causation and prevention of injury trauma.

### Incident Description:

According to the materials reviewed, on December 1, 2019, at approximately 10:58 a.m., Mr. Leonard Villanova, a 48-year-old man at the time, reportedly hurt his back when he tried to move a $CO_2$ cylinder located within the $CO_2$ room at Merck's North Wales Facility located at 351 N Sumneytown Pike in North Wales, Pennsylvania.

### Materials Reviewed:

As part of my analysis in this matter, I reviewed numerous documentary materials, including, but not limited to, the following:

- Allied Universal Security Services Incident Report dated December 1, 2019

- Merck Final Investigation Report dated January 14, 2020

- Merck Investigation Packet

- Color photograph of the subject location

- Color reproduction of a photograph of the subject location

- Service Contractor Agreement dated June 15, 2018

- Complaint

Frank W. Baer, Esq.
December 4, 2023
Page 3



- Plaintiff's Response to Interrogatories of Defendants

- Plaintiffs' Responses to Loss of Consortium Interrogatories of Defendants

- Plaintiffs' Response to Defendants' Requests for the Production of Documents

- Plaintiff's Reply to New Matter of Defendant Merck Sharp & Dohme Corp.'s f/k/a Merck & Co., Inc.

- Plaintiff's Reply to New Matter of Defendant Airgas USA LLC

- Plaintiff's Reply to New Matter of Defendants Jones Lang LaSalle Americas, Inc. D/B/A JLL and/or Labwell

- Defendant, Airgas USA, LLC's Answer to New Matter CrossClaim of Defendant, Jones Lang LaSalle Americas, Inc. D/B/A JLL and/or Labwell

- Defendant, Airgas USA, LLC's Answer to New Matter CrossClaim of Co-Defendant, Merck Sharp & Dohme Corp.'s f/k/a Merck & Co., Inc.

- Defendants, Jones Lang LaSalle Americas, Inc. D/B/A Jones Lang LaSalle and JLL, Jones Lang LaSalle – Northeast, Inc. d/b/a Jones Lang LaSalle and JLL, Jones Lang LaSalle of Pennsylvania, Inc. d/b/a Jones Lang LaSalle and JLL, Jones Lang LaSalle IP Inc. d/b/a Labwell, Answers to Plaintiffs' Interrogatories

- Defendants, Jones Lang LaSalle Americas, Inc. D/B/A Jones Lang LaSalle and JLL, Jones Lang LaSalle – Northeast, Inc. d/b/a Jones Lang LaSalle and JLL, Jones Lang LaSalle of Pennsylvania, Inc. d/b/a Jones Lang LaSalle and JLL, Jones Lang LaSalle IP Inc. d/b/a Labwell, Responses to Plaintiff's Request for Production of Documents

- Answer of Defendant, Merck Sharp & Dohme Corp.'s f/k/a Merck & Co., Inc. to Plaintiffs' Complaint with New Matter and New Matter CrossClaims

- Defendants Merck Sharp & Dohme Corp. f/k/a Merck & Co., Inc. and Merck Sharp & Dohme Corp. d/b/a Merck Human Health Division U.S. Human Health's Answers to Plaintiffs' Interrogatories

- Defendants Merck Sharp & Dohme Corp. f/k/a Merck & Co., Inc. and Merck Sharp & Dohme Corp. d/b/a Merck Human Health Division U.S. Human Health's Responses to Plaintiff's Request for Production of Documents

- Merck Sharp & Dohme Corp.'s Reply to New Matter CrossClaim of Co-defendant Airgas

- Deposition Transcript of David Lichten taken on March 4, 2021

- Deposition Transcript of Thomas F. Keelty taken on September 20, 2022

- Deposition Transcript of James D. Gregg taken on October 27, 2022

- Deposition Transcripts of Plaintiff Leonard Villanova taken November 16, 2022 and February 23, 2023

- Deposition Transcript of Scott Doll taken February 2, 2023

- Deposition Transcript of Karen Villanova taken on February 23, 2023

- Deposition Transcript of Frank McWilliams taken on August 2, 2023



- Deposition Transcript of Kevin Reilly taken on April 27, 2023

- Deposition Exhibits

- Claim File

- Discovery Materials

- Medical Records pertaining to Leonard Villanova

- Expert Witness Report of John W. Standard dated October 18, 2023

- Narrative Reports of David L. Lichten dated March 14, 2021 and March 3, 2023

- Alex Karras Life Care Addendum dated September 26, 2023

- High Level Second Opinion Reports of Alexander R. Vaccaro dated February 23, 2021 and April 13, 2021

- Independent Medical Examination Supplemental Report of Amir H. Fayyazi dated October 7, 2020

- Independent Medical Examination Report of Peter D. Le Roux dated September 1, 2023

- Occupational Safety and Health Administration (OSHA) website, www.osha.org

- Publicly available literature, including, but not limited to, the documents cited within the report, learned treatises, textbooks, and scientific standards.

**Findings:**

The subject property was part of a facility owned by Merck, which encompassed the Upper Gwynedd and North Wales campuses and included four buildings. Jones Lang LaSalle Americas (JLL) was hired by Merck to manage the facility. JLL subsequently hired U.S. Facilities (USF). Part of USF's responsibilities was to monitor alarms during off hours (e.g., nights and weekends). Leonard Villanova was an employee of USF, working as a Central Utility Plant (CUP) Operator. CUP Operators were positioned at the Upper Gwynedd Utility Plant and monitored the building automation system. As part of the responsibility of a CUP Operator, they would respond to alarms. CUP Operators were limited as to what equipment they were allowed to touch, but there was no written policy regarding how to respond to alarms.

Prior to the subject incident, in Building 1 at the North Wales site, there was a recent change for supplying carbon dioxide ($CO_2$) to laboratory incubators from dewars to gas cylinders. The cylinders were being stored in Room 121A High Density Storage within the North Wales campus. [Figure 1] Contained in the room was a manifold rack, a storage rack, and a rack for empty cylinders. [Figure 2] Approximately one week prior to the subject incident, JLL requested that the USF CUP Operators expand their responsibilities from only monitoring the low $CO_2$ alarm to switching over the $CO_2$ cylinders if a cylinder ran empty. During an alarm response on the Friday before the subject incident, a different operator, Kevin Bridges, connected a full cylinder to the manifold to clear the alarm condition. The empty cylinder was removed from the front of the manifold rack and left on the outside of the spare rack. The subject incident occurred during the response to a second alarm over the weekend.

Based on the Merck Final Investigation Report, over the holiday weekend, UG Command Center called the Central Utility Plant (CUP) Operator to respond to a low $CO_2$ alarm. Upon arrival, the CUP Operator "connected a full cylinder to the manifold and then proceeded to move cylinders from the

Frank W. Baer, Esq.
December 4, 2023
Page 5



manifold and spare racks. The manifold change to a full cylinder was the only activity expected". The movement of the cylinders was not an activity the CUP Operator was expected to perform. When the CUP Operator "went to move a full spare cylinder, there was a need to move a cylinder that was wedged between two other cylinders." Upon attempting to move the wedged cylinder, the CUP Operator experienced pain in his back and called UG Command Center for assistance and then was transported to the hospital.



**Figure 1. Room 121A High Density Storage.**



**Figure 2. $CO_2$ cylinders within 121A located in the manifold rack (left) and storage (right) racks.**

Based on Rothman Institute records dated January 8, 2020, Mr. Villanova was 5 feet, 6 inches in height and weighed approximately 240 pounds at the time of the subject incident.

*Deposition Testimony*

Mr. Villanova testified that he started working for U.S. Facilities on May 8, 2017 as a Central Utility Plant (CUP) Operator and always worked at the Merck campus after receiving his initial orientation. Mr. Villanova further testified that he had prior work experience handling cylinders that were of the same style and similar size as the $CO_2$ cylinders. According to Mr. Villanova, he had received safety training, including training in regards to handling cylinders. Mr. Villanova testified that as part of his



safety training, team lifting was implemented for any object that weighed over 25 pounds and cylinders should be moved using a cart.

According to Mr. Villanova, he was hired to work the second shift but sometimes covered other shifts. Mr. Villanova testified that he worked out of the CUP room and monitored the equipment on the Upper Gwynedd and North Wales campuses. Mr. Villanova further testified that responding to alarms was part of his job responsibilities, and that if there was an emergency or alarm, he would go check out the situation prior to looking at the job safety analysis (JSA). According to Mr. Villanova, at the North Wales facility he had reported to the $CO_2$ room in response to alarms in the past but he had never handled any of the $CO_2$ cylinders. Mr. Villanova specified that he had never been asked to move cylinders on prior occasions and specifically indicated that prior to the subject incident he understood that he should not be touching things in the room.

Mr. Villanova testified that the subject incident occurred on the Sunday of Thanksgiving weekend and that he had started his shift at 9:00 a.m. According to Mr. Villanova, he received a call from Kevin Reilly, the JLL Facility Manager, indicating that an alarm had gone off in the $CO_2$ room. Mr. Villanova further testified that he read the bulleted set of instructions, which was emailed to him by Glenn Crawford, regarding how to change the $CO_2$ cylinders. Mr. Villanova further testified that the instructions did not include any steps or information related to moving the $CO_2$ cylinders. Mr. Villanova testified that he did not bring the instructions with him when he went to the $CO_2$ room. According to Mr. Villanova, he could not recall if he switched the manifold, but he did observe that the reading was low on the manifold and was able to silence the alarm. Mr. Villanova testified that he proceeded to clean up the area and organize where the spares could be placed. Mr. Villanova specified that there was an empty cylinder "standing out" of the racks that "needed to go somewhere" so he attempted to find a place to put it by organizing the spare cylinders even though he knew that used cylinders should not be stored with full cylinders. Mr. Villanova testified that there was another rack positioned to the right of the manifold rack that contained full cylinders. Mr. Villanova further testified that he used a cart, which was located in the room, to move the empty cylinder. According to Mr. Villanova, he attempted to pull one of the full cylinders forward so he could place the empty cylinder in the back of the rack. Mr. Villanova testified that he tried to pull the cylinder with his right hand but it would not move, so he pulled the cylinder with two hands and felt pain in his back.

James Gregg, the Lab Service Supervisor for Labwell/JLL, testified that $CO_2$ was originally delivered in liquid form using dewars canisters, but in 2019 there was a switch to compressed gas cylinders. Mr. Gregg further testified that he was directed by JLL to train Scott Doll and Glenn Crawford regarding the procedure for responding to the $CO_2$ alarm. According to Mr. Gregg, he held a meeting on November 27, 2019 in the CO2 room with Scott Doll and Glenn Crawford within which he showed them the steps for changing the manifold. Mr. Gregg specified that the CUP Operators were only expected to "change out a cylinder" and he verbally provided the instruction that the cylinders were already in place and that moving cylinders was not expected. Mr. Gregg testified that he wrote out the instructions after the meeting and provided it to Glenn Crawford. Mr. Gregg further testified that since the CUP Operators were only expected to change the manifold, he did not include any other instructions, including instructions about moving cylinders or information about the storage rack or empty rack. According to Mr. Gregg, he posted the instructions by the manifold and expected Scott Doll, who was the "connection" to the off-hours USF employees, to instruct the other CUP Operators, including Mr. Villanova. Mr. Gregg testified that he was not copied on the e-mail from Glenn Crawford to the CUP Operators, but if he was he would have chimed in and indicated that there was no need to move any cylinders. Mr. Gregg testified that on Wednesday evening prior to the subject incident there were four full cylinders in the manifold rack with two cylinders hooked up and two



cylinders positioned behind them ready to use. Mr. Gregg further testified that the four cylinders were sufficient to last the entire holiday weekend with two manifold changes expected over the weekend. Mr. Gregg testified that he was present Wednesday afternoon when Airgas delivered six full tanks and placed them in the storage rack near the manifold rack. Mr. Gregg further testified that he had never seen the cylinders lodged before in the storage rack and never received any complaints from Airgas that the rack was not sufficient. According to Mr. Gregg, on Monday morning he moved one empty cylinder around the corner and one empty cylinder had been placed in the storage rack.

Frank McWilliams, a truck driver and yardman employed by Airgas, testified that among other items, he transported high pressure gas cylinders. Mr. McWilliams further testified that he made deliveries to the Merck campus many times. According to Mr. McWilliams, the first time that he delivered to the facility he was provided with instructions regarding where to put the cylinders but not how to put the cylinders. Mr. McWilliams testified that he delivered six full $CO_2$ cylinders, containing 50 pounds of $CO_2$ each, to the subject location on November 27, 2019 at approximately 2:49 p.m. and removed any empty cylinders. Mr. McWilliams estimated that a full tank of $CO_2$ weighed over 100 pounds. Mr. McWilliams further testified that he placed the cylinders in a steel rack.

Glenn Crawford, the Project Manager for USF at the Merck facility in North Wales, testified that he attended the training session during the week prior to the subject incident, in which the response to the low $CO_2$ alarm was discussed. Mr. Crawford testified that the training received was adequate. Mr. Crawford further testified that Scott Doll, who also attended the training session, was responsible for training the off-hours CUP operators, including Mr. Villanova and Kevin Bridges. According to Mr. Crawford, he never followed up to determine if the training had occurred but he did forward the step-by-step instructions to the CUP Operators. Mr. Crawford testified that when the cylinders are hooked up, switching over the cylinders requires an individual to "throw a lever on the equalizer". Mr. Crawford further testified that the CUP Operators were only expected to switch the regulators over to the other cylinders and throw the lever. According to Mr. Crawford, during the training session it was understood that the CUP Operators were not supposed to move the cylinders and that the verbiage he used in the e-mail he sent regarding the full cylinders did not come from JLL. Mr. Crawford testified that on Monday morning after the subject incident he observed that the cylinders in the storage rack were wedged in place. Mr. Crawford further testified that he was not aware of any prior issues with cylinders being wedged into the racks. According to Mr. Crawford, the storage rack was large enough to accommodate the cylinders but they became jammed due to the placement of the cylinders within the rack. Mr. Crawford testified that the following day he was able to remove the tank by spinning (i.e., rolling) the cylinder loose and not by lifting it, as is taught in the USF safety training. Mr. Crawford specified that USF had safety procedures and JSAs regarding the safe handling of compressed gas cylinders and that pulling forcefully on a stuck cylinder would be an unsafe act. Mr. Crawford testified that the safety training of the CUP Operators was the responsibility of USF and Industrial Risk Control, an agent of USF, and presented through the PureSafety program. Mr. Crawford further testified that Merck provided general training.

Thomas Keelty, who worked for Industrial Risk Control ("IRC"), testified that USF hired IRC to manage and provide direction to all of USF regarding their Environmental Health and Safety Programs. Mr. Keelty further testified that USF utilized the Underwriter's Laboratories PureSafety Training Program, which included training regarding handling compressed gas cylinders. As part of his training, Mr. Villanova would have received a binder with all the JSAs. Mr. Keelty testified that Mr. Crawford did not make him aware of the new response procedure to the $CO_2$ alarm prior to the subject incident.



Mr. Keelty testified that the new job task consisted of moving a handle. Mr. Keelty further testified that he did not consider the subject task as high risk. According to Mr. Keelty, a JSA is not always necessary, especially for low risk tasks. Mr. Keelty testified that instructions may be sufficient for low risk tasks. Mr. Keelty further testified that he did not know why Mr. Villanova was trying to pull out a cylinder. According to Mr. Keelty, moving a cylinder was not an issue, the issue was that one of the cylinders was jammed, which would not have been anticipated when developing the instructions. Mr. Keelty testified that Mr. Villanova was trying to do more than what was specified.

Kevin Reilly, the JLL Facility Manager at the Merck facility in North Wales, testified that he was responsible for overseeing the four buildings owned by Merck at the subject location and one leased facility at the site. Mr. Reilly further testified that he oversaw the facilities integration by representing Merck's needs from a business perspective and implement JLL's facility management contract practices. Mr. Reilly specified that he provided overall oversight of the subject building but IRC would oversee safety for USF. According to Mr. Reilly, a JSA "identified the tasks for a particular job and it identifies any safety related items towards those tasks." [Reilly dep p18] Mr. Reilly testified that standing JSAs existed for certain tasks that applied to all workers. Mr. Reilly further testified that USF was responsible for developing JSAs for the tasks that they performed. Mr. Reilly clarified that alarms are acknowledged on the computer that is monitored by the CUP Operators but the alarm does not stop until the manifold lever is moved from left to right or right to left. Mr. Reilly testified that the process of moving a manifold lever to silence an alarm is a task that was not new and had been performed for a long time, even when dewars were used up until 4-5 months prior to the subject incident. According to Mr. Reilly, the manifold would automatically switch from an empty cylinder to a full cylinder. Mr. Reilly testified that over a regular weekend no further actions would be required since each cylinder lasted approximately 1½ days. Mr. Reilly further testified that due to the long weekend, four cylinders were placed in the manifold rack to have enough cylinders in place to make it until Monday. According to Mr. Reilly, since the change to compressed CO2 was still a relatively new process, there was still an effort to record the consumption of the cylinders so the CUP Operators were asked to write down, on a tag, the times that the cylinders became empty and then use the manifold handle to silence the alarm, as done in the past. Mr. Reilly testified that adequate instructions were provided regarding changing the hose from the empty to full cylinder, which was already located within the manifold rack. Mr. Reilly further testified that a Train-the-Trainer training session was provided to go over the instructions. According to Mr. Reilly, it was Mr. Crawford's responsibility, as the lead for USF, to make sure that his team was adequately trained. Mr. Reilly testified that in general JLL did not rely on USF to move cylinders, and specifically, JLL did not require any material handling from USF to perform the subject task. Mr. Reilly further testified that he was not aware of any prior injuries resulting from cylinders being wedged into the rack.

Scott Doll, an employee of USF, was the CUP lead at the Merck facility for approximately 11 years prior to incident. Mr. Doll testified that as the CUP lead, he supervised all of the CUP operators, including Mr. Villanova. Mr. Doll further testified that the CUP Operators received training on an annual basis that included information on compressed gases. Mr. Doll testified that he attended the training session by James Gregg and that there was no expectation that cylinders would need to be moved over the weekend but he did not recall telling Mr. Villanova. Mr. Doll further testified that he did not specifically go over the training with Mr. Villanova or Kevin Bridges but he talked to Mr. Villanova during the shift change meeting. According to Mr. Doll, he expected the CUP Operator on shift prior to Mr. Bridges to provide him with the instructions, but he never followed up to see if it occurred. Mr. Doll testified that he would not expect a Management of Change (MOC) for this task and that USF was frequently given new responsibilities without an MOC. Mr. Doll further testified



that the instructions provided covered the information that would have been in a JSA. According to Mr. Doll, Mr. Villanova was a good employee who went above and beyond his duty.

**Safety Analysis and Discussion:**

Mr. Villanova alleges that he was injured when he pulled on a $CO_2$ compressed gas cylinder that was wedged into a storage rack on the Merck North Wales campus. Within the analysis presented, JLL will be used to identify JLL, as an agent of Merck, and Merck, as the property owner. At the time of the subject incident Mr. Villanova was a CUP Operator who was monitoring, among other things, the low $CO_2$ alarm in Room 121A. As part of his job responsibilities, Mr. Villanova had been monitoring alarms, but, approximately one week prior to the subject incident, JLL expanded the job responsibilities of the CUP Operators to include switching over the $CO_2$ cylinders if a cylinder ran empty. JLL employees performed this task during the day and provided instructions to USF through an in-person training session to the USF Project Manager and the USF lead CUP Operator and written instructions that were e-mailed to USF and posted near where the work was to be performed. Based on the materials reviewed, Mr. Villanova received the instructions and successfully performed the switch over procedure that was required when the low $CO_2$ alarm sounded on Sunday morning. There is no evidence that the instructions performed were not adequate for the job task to be performed. Based on Mr. Villanova's testimony, he was injured while he was attempting to move cylinders that were in the storage rack. There was no expectation, requirement, or necessity for Mr. Villanova to move any cylinders to complete his task. In fact, Mr. Villanova testified that he had never been asked to move cylinders in the past. Mr. Villanova testified that he was trying to clean or organize the area for the next person even though this was not part of the assigned task. It is unclear exactly what task Mr. Villanova was trying to perform at the time that he was injured given that he testified to know that full and empty cylinders were not to be stored together. Regardless, if he had questions about the task, he could have contacted Mr. Crawford or Mr. Reilly, whom he had recently communicated with about the alarm. Mr. Villanova would not have been injured as he described if he had responded to the alarm as assigned and followed the instructions provided. Based on the materials reviewed, the cylinders initially placed within the manifold rack were sufficient for the entire long weekend and there was no immediate need for any cylinders to be moved. Furthermore, Mr. Villanova had received safety training in regards to handling compressed gas cylinders and should have known that he was not supposed to lift cylinders because cylinders are moved by tilting and rolling them or using a cart. Mr. Villanova's actions were contrary to the safety training that he had been provided.

The Occupational Safety and Health Administration's (OSHA) mission is "to ensure that employees work in a safe and healthful environment by setting and enforcing standards, and by providing training, outreach, education and assistance."[2] OSHA general industry regulations are stipulated in 29 CFR 1910. OSHA provides workplace safety standards and regulations to ensure safe working conditions for workers. According to the OSHA General Duty Clause (Section 5(a)(1) of the OSH Act of 1970) "Each employer shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." It is the responsibility of an employer to initiate and maintain programs to comply with applicable OSHA regulations for the work being performed. Although JLL/Merck had general controlling authority over the site, USF, as Mr. Villanova's employer, was responsible for accident prevention, an accident prevention program, inspection of the job site, and training of employees relating to the work that they are required to perform.

JLL provided instructions for the task that needed to be performed. JLL was not obligated to provide

---

[2]    OSHA website – www.osha.gov



instructions for all of the tasks that Mr. Villanova was not asked to do. Furthermore, JLL indicated during the in-person training session that the CUP Operators were not expected to move any cylinders. It was the USF personnel who failed to provide that information to the CUP Operators. Furthermore, JLL was not aware of the e-mail that Mr. Crawford sent to the CUP Operators in which he erroneously indicated that movement of a cylinder may be necessary even though JLL had set up the system such that there would be sufficient $CO_2$ cylinders in the manifold rack. Written instructions were provided for the task that Mr. Villanova was required to perform. The switch-over task was low risk and did not require a JSA. A JSA, and generally hazard analyses, is a procedure that helps integrate accepted safety and health principles and practices into a particular task or job operation. The goal of a JSA is to identify potential hazards of a specific procedure and to control or prevent these hazards.[3,4] As indicated above, Mr. Villanova was not injured performing the required task. A JSA for the required task would not have identified any potential hazards related to moving cylinders since the movement of cylinders was not part of the task. Furthermore, Mr. Villanova was allegedly injured due to the cylinders being jammed in the storage rack. A JSA for the required task would not have been required to address this possibility. To the extent that a cylinder jammed in the storage rack was causative of the subject incident, Airgas was responsible for delivering the cylinders and placing them within the storage rack. Based on the materials reviewed, there is no evidence of cylinders being jammed in the past or evidence that the storage rack was not large enough to hold the six cylinders that were delivered. In addition, there is no evidence that the full cylinders that were allegedly jammed were not in the same condition at the time of the subject incident as they were when they were delivered by Airgas.

As part of my analysis, I reviewed the report of John W. Standard dated October 18, 2023. Mr. Standard opines that there was a lack of proper safety protocols and training provided to Mr. Villanova in regards to the task he performed. Mr. Standard does not appear to address the difference between the task that was required of Mr. Villanova and the task that he performed. There is no evidence that the instructions provided were inadequate or that the completion of an MOC or JSA for the required task would have affected the outcome of the subject incident. As indicated above, Mr. Villanova successfully completed the required task, which consisted of moving the manifold lever and changing a hose. In regards to the task that Mr. Villanova was attempting to perform, which was not part of his responsibility, he was reportedly injured when he attempted to move a cylinder that was wedged or stuck when he was trying to "organize" the extra cylinders. Based on the materials reviewed, USF did maintain safety protocols and a JSA regarding the handling of compressed gas cylinders. To the extent that his training was inadequate, that would have been the responsibility of USF, not JLL and/or Merck. Mr. Standard further opines that Mr. Villanova's actions were not a causative factor of the subject incident and his subsequent injuries simply due to the fact that the incident investigation reports did not indicate as such and not based on his own safety analysis. Mr. Standard purports that the task required of Mr. Villanova was a new, "non-routine job task" that required additional analyses and documentation but he seems to neglect to consider the fact that the task was routine and had been completed successfully for years without incident or injury. The task of changing a manifold hose was only new for Mr. Villanova and the other CUP Operators. As indicated already, the instructions to Mr. Villanova were adequate in that he completed the required task without incident. Mr. Villanova was only caused to be injured when he attempted to perform a task that was outside the scope of the required task. Finally, although Mr. Standard purports to a lack of training by JLL and Merck, it is noted that JLL and Merck, through the train-the-trainer session and through written instruction, were

---

3    OSHA website – www.osha.gov
4    Roland, H.E. and Moriarty, B. (1990). *System Safety Engineering and Management*, Second Edition. New York: John Wiley & Sons, Inc.

Frank W. Baer, Esq.
December 4, 2023
Page 11



the only entities to provide Mr. Villanova with adequate training in regards to the new task. Based on the testimony provided, both Mr. Crawford and Mr. Doll failed to ensure that Mr. Villanova clearly understood the scope of the task that he was asked to perform. Mr. Standard is silent in regards to USF's responsibility in regards to training Mr. Villanova.

**Conclusions:**

Based upon a reasonable degree of scientific certainty, and the information received to date, I conclude the following:

1. On December 1, 2019, at approximately 10:58 a.m., Mr. Leonard Villanova, a 48-year-old man at the time, reportedly hurt his back when he tried to lift a $CO_2$ cylinder located within the $CO_2$ room at Merck's North Wales Facility located at 351 N Sumneytown Pike in North Wales, Pennsylvania.

2. Mr. Villanova was trained in the proper handling of compressed gas cylinders.

3. Mr. Villanova was familiar with responding to alarms at the subject location but had not previously been asked to move any compressed gas cylinders.

4. Mr. Villanova, as a Central Utility Plant Operator was provided with instructions to perform the required task of switching over $CO_2$ cylinders. This task did not require the movement of $CO_2$ cylinders.

5. Mr. Villanova responded to a low $CO_2$ alarm and successfully switched over a full cylinder for an empty cylinder located within the manifold rack.

6. There was no expectation or requirement for compressed gas cylinders to be moved during the execution of the job task required to be performed by Mr. Villanova. Mr. Villanova chose to engage in work that was outside the scope of the work tasks that he was required to perform.

7. Mr. Villanova attempted to move a cylinder weighing over 100 pounds without tilting it, spinning it, or rolling it as he was trained.

8. Mr. Villanova's actions, or lack thereof, were causative factors of the subject incident and his subsequent injuries.

9. Jones Lang LaSalle provided verbal and written instructions that were adequate for the job task to be performed.

10. It was the responsibility of U.S. Facilities to provide adequate training to Mr. Villanova, including necessary refresher training, regarding recognizing potential hazards.

11. U.S. Facilities failed to provide Mr. Villanova with an accurate representation of the instructions provided by Jones Lang LaSalle.

12. U.S. Facilities' actions, or lack thereof, were a causative factor of the subject incident.

13. The job task required of Mr. Villanova presented a low-risk. A job safety analysis, beyond the instructions provided, was not required for the job task.

14. Jones Lang LaSalle's actions, or lack thereof, were not a causative factor of the subject incident.

15. Jones Lang LaSalle's actions, or lack thereof, were reasonable in regards to their efforts to furnish Mr. Villanova with a place of employment free from recognized hazards.

Frank W. Baer, Esq.
December 4, 2023
Page 12



If you have any questions, require additional assistance, or if any additional information becomes available, please do not hesitate to call.

Sincerely,

Angela Levitan, Ph.D., CPE
Senior Biomechanist/Human Factors Engineer